**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **SHERMAN CARTER,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:19-cv-207 (MTT)** |
| | ) | |
| **LOUIS DEJOY,** | ) | |
| **Postmaster General** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Defendant, Louis DeJoy, Postmaster General of the United States Postal Service

(the "Postal Service"), moves for summary judgment.  Doc. 40.  For the following

reasons, the Postal Service's motion (Doc. 40) is **GRANTED**.

## I.  BACKGROUND[1]

Sherman Carter is an African American male who was a Postal Service

employee for thirty-two years until he retired on March 21, 2015.  Docs. 4 at 2-3; 42-3 at

15:15-22; 42-4 at 2.  Carter began working for the Postal Service in Illinois, where he

---

[1] The Postal Service argues that because Carter "failed to respond with an independent statement of disputed facts, even though the Court issued a Notice of Summary Judgment Motion on October 22, 2020," that "the Court should deem its itemized statement of material facts undisputed for purposes of summary judgment."  Doc. 46 at 2-3.  Carter did fail to respond to the Postal Service's statement of disputed facts.  However, as required, the Court has still "review[ed] the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact."  *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (citation and quotation marks omitted).  And despite the deficiencies in Carter's response, because Carter is proceeding pro se, and because summary judgment would lead to dismissal of his claims with prejudice, the Court has undergone a full analysis of Carter's claims for relief regardless of these failings and insufficiencies in his response.  *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." (citation omitted)).  Therefore, if the evidence in the record shows that a fact is disputed, the Court draws all justifiable inferences in Carter's favor for purposes of summary judgment.

became a Postmaster in 2008.  Doc. 42-3 at 17:18-22, 26:1-3.  In 2012, he moved from

Illinois to work as a Postmaster in Jackson, Georgia.  *Id*. at 24:13-25:21.  Carter's wife,

also a Postal Service employee at the time, took a position with the Postal Service in

Morrow, Georgia.  *Id*.

On November 27, 2013, Carter was reassigned to other duties after multiple

Postal Service employees accused him of sexual harassment.  Docs. 40-3 at 1-2; 42-3

at 178:9-195:25.  On July 2, 2014, the Postal Service issued a "Notice of Proposed

Removal," and on August 20, Carter was removed from his position.  Docs. 42-3 at

39:16-40:13; 42-4 at 2.  Carter appealed his removal to the Merit Systems Protection

Board ("MSPB").  While that appeal was pending, Carter and the Postal Service, on

October 27, 2014, negotiated a settlement that resolved all issues between Carter and

the Postal Service.  Doc. 42-4.

In exchange for dismissal with prejudice of Carter's appeal, the Postal Service

agreed to allow Carter to work until his normal retirement date—March 21, 2015—to

receive his pension benefits.  Doc. 42-4.  The agreement was very specific about

Carter's status and duties during his short reinstatement period.  Carter was to return to

work on November 1, 2014, and for the remainder of 2014, "[Carter was to] work

primarily in Christmas Terminal Handling Operations ("CTHO").  Otherwise, the Postal

Service [would] set the position(s) and tour times through until March 21, 2015."  *Id*. at

2.  According to Carter, Pamela Mauldin, Human Resources Manager for the Postal

Service's Atlanta District, was Carter's immediate supervisor after his return to work,

and Mauldin provided his work assignments.  Doc. 42-3 at 161:2-8, 164:10-13.

However, Mauldin denies that she provided the assignments at issue.  Doc. 40-4 at 11-12.

As it turned out, the CTHO was not operational on November 1.  Doc. 42-3 at 33:5-15.  So, on November 5, 2014, Carter reported to the Atlanta Network Distribution Center ("Atlanta NDC").  *Id*. at 34:3-14.  But when he arrived there, the Atlanta NDC manager told Carter to report to the "301 TH" facility.  *Id*. at 34:9-19.  Carter worked there until "November 26th, 27th," then he moved to the CTHO.  *Id*. at 34:25-35:6.  Carter's CTHO assignment ran until January 4, 2015.  *Id*. at 42-3 at 40:21-41:1.  On January 5, Carter reported back to 301 TH, where he remained until his March 21 retirement.  *Id*. at 41:6-42:25.

On March 6, 2015, Carter filed a second complaint with the Postal Service's EEO office, alleging that from November 2014 to March 2015, the period covered by the settlement agreement, (1) he was subjected to discrimination based on his race, color, sex, and age concerning his work assignments and overtime; (2) he was subjected to a hostile work environment; and (3) he faced reprisal for protected EEO activity.  Doc. 4 at 7-8, 28-33.  This lawsuit followed.

Determining Carter's claims and the factual basis for those claims from his complaint is difficult.  But Carter attached to his complaint an administrative decision itemizing ten allegedly adverse actions.  *Id*. at 7-10.  In his deposition, Carter confirmed that these are the bases for his claims and that each was discriminatory or was done in retaliation for his protected activity.  *See generally* Doc. 42-3.  Accordingly, the Court addresses them in the order discussed at the deposition.

*1.   Carter alleges that he was not provided with work assignments before returning to work.*   Docs. 40-2 at 4; 42-3 at 29:12-16.   Carter was to begin working at the CTHO beginning November 1, 2014 but had yet to receive official instructions from the Postal Service.   Docs. 40-2 at 4; 42-3 at 29:18-31:22.

*2.   Carter claims that he was improperly required to use a "PS Form 1261" to document his time.*   Docs. 40-2 at 4; 42-3 at 66:9-11.   Carter argues that he should have been placed on "auto pay."   Docs. 40-2 at 4; 42-3 at 66:9-23.

*3.   Carter claims that he was not paid properly while working at the CTHO.* Docs. 40-2 at 5; 42-3 at 76:8-10.   During his time at the CTHO, Carter was assigned overnight work hours.   Docs. 40-2 at 5; 42-3 at 76:17-78:12.   Because of his overnight schedule, Carter said he was owed "night differential" pay.   Docs. 40-2 at 5; 42-3 at 76:17-78:12.

*4.   Carter claims that he was denied computer access from November 1, 2014, through January 21, 2015.*   Docs. 40-2 at 6; 42-3 at 85:22-24.   At the Forest Park Post Office, Sharlene Vasser, the acting supervisor, denied Carter access to a computer, and Debra Shannon, a supervisor, denied access at the McDonough location.   Docs. 40-2 at 6; 42-3 at 85:22-89:12, 104:5-105:4.   Carter was provided computer access shortly after his email request to Mauldin.   Docs. 40-2 at 6; 42-3 at 94:24-95:6; 44-10.

*5.   Carter claims that he was improperly assigned to the Atlanta NDC plant on November 5, 2014.*   Docs. 40-2 at 8; 42-3 at 107:14-108:17.   When he arrived at the Atlanta NDC plant, the manager told Carter that he would be working at the 301 TH facility.   Doc. 42-3 at 34:5-35:6.

**6.  Carter claims that he was improperly assigned to the 301 TH facility from November 15, 2014, through November 23, 2014.**  Docs. 40-2 at 8; 42-3 at 121:15-18.  While working at 301 TH, Carter alleges that he did no postal work and felt marginalized and alienated from his co-workers.  Docs. 40-2 at 8; 42-3 at 121:16-122:8.

**7.  Carter claims that his wife was improperly charged with sixteen hours of being absent without official leave ("AWOL").**  Docs. 40-2 at 9; 42-3 at 127:13-17.  Carter claims that his wife was improperly charged with being AWOL to harass him.  Docs. 40-2 at 9; 42-3 at 127:20-128:2.  Mrs. Carter's claim that the AWOL charge was improper was dismissed after a hearing.  Docs. 40-2 at 9; 42-5.

**8.  Carter claims that his supervisor did not provide him with an end-of-year performance discussion and improperly entered "employee being separated" into the comment section of Carter's evaluation.**  Docs. 40-2 at 7; 42-3 at 141:19-25.  Carter's supervisor, Theodore Lowery, completed Carter's performance evaluation on November 3, 2014.  Doc. 44-14 at 1.  Lowery was unaware of Carter's now settled EEO complaint, and he did not have an end-of-year discussion with Carter.  Docs. 40-7 at 2; 44-14 at 1.  Instead, Lowery wrote, "Separated or Retired – Employee pending separation" on Carter's performance review to explain why the review had not occurred.  Docs. 40-7 at 2; 44-14 at 1.

**9.  Carter claims that he was isolated from his peers and other employees, and that the Postal Service inflicted hardships on Carter and his family.**  Docs. 40-2 at 5; 42-3 at 156:20-157:1.  Carter alleges that the Postal Service failed to make his return to work a "smooth transition."  Docs. 40-2 at 5; 156:20-157:13.  Particularly, Carter alleges that the Postal Service "sought to isolate" him upon his return to work by

placing Carter "where there were no [Postal Service] employees."  Docs. 40-2 at 5; 42-3 at 160:24-162:10.

**10.  Carter claims that he was subjected to ongoing harassment, as it was "one thing after another."**  Docs. 40-2 at 7; 42-3 at 165:7-13.  This omnibus claim is based on Carter's belief that "this many coincidences [could not] happen to the same person and especially when it's under the control of those who are your superiors."  Docs. 40-2 at 7; 42-3 at 166:2-166:7.

After Carter's retirement, an event occurred that, according to the parties' briefs, gave rise to a separate claim.  When Carter's administrative claim was pending, but after his retirement, Postal Service attorney Sion New deposed Carter on December 9, 2016.  *See generally* Doc. 42-3.  New asked Carter if he had a copy of the application for an annuitant position Carter had in Austin, Texas at the time of the deposition.[2]  Doc. 42-3 at 10:8-11:13, 208:17-19.  Carter responded, "No, but you can find it.  Knock yourself out.  Why would I have it with me?"  *Id*. at 208:20-21.  On December 14, New's paralegal contacted Carter's supervisor, Debra Foster, about the annuitant position in question; Foster documented the conversation in a December 23 letter, which Carter attached to his complaint.  Docs. 4 at 21; 40-9.  According to Foster, New's paralegal asked if Foster had Carter's application, Foster said that she did not have it and she referred the paralegal to someone Foster believed would be of assistance.  Docs. 4 at 21; 40-9.

---

[2] Annuitant positions are part-time positions offered to retired Postal Service employees.  Doc. 42 at 64:6-66:15, 87:4-90:5.  Notices are sent to retirees announcing future openings.  *Id*.  Available positions depend on need and can be for various tasks, *e.g.*, "rural route count" or part-time work during Christmas.  *Id*.

## II.  SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id*. (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

Carter's complaint asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 for (1) race discrimination, (2) sex discrimination, and (3) retaliation for engaging in protected activity.  Doc. 4 at 1-4.  The parties agree that the complaint also includes a claim for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634.[3]  *Id*.  The parties also agree that the complaint alleges a hostile work environment claim and, perhaps, a retaliatory hostile work environment claim.  *Id*.  Finally, the parties believe that the complaint asserts a claim or claims arising from the December 14, 2016 post-deposition phone conversation concerning efforts to obtain a copy of Carter's annuitant position application.  It does not.  Nothing in the complaint alleges a discernable claim arising

---

[3] Whether Carter asserted an age discrimination claim is debatable.  Carter checked, then struck through and initialed the ADEA box on his complaint form, indicating, it seems, that he was not pursuing an ADEA claim.  Doc. 4 at 1.  But out of an abundance of caution, the Court assumes that Carter intended to assert an age discrimination claim.

from that event.  In his brief, Carter labels this purported claim "Retaliation-violation of Privacy Act, Harassment, Creation of a Hostile Environment by Atlanta USPS attorney Sion New."  Doc. 44 at 9.  The Postal Service, in its brief, characterizes the claim as a "retaliation claim against agency counsel Sion New."  Doc. 40-1 at 17.

The parties initially analyzed Carter's race, sex, and age discrimination and retaliation claims under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Docs. 40-1 at 5-19; 44 at 2-10.  The parties also analyzed Carter's hostile work environment claim using the "severe or pervasive" standard.  Docs. 40-1 at 19-20; 44 at 10-11.  But things have changed.

In *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the Supreme Court held that the proper standard for analyzing discrimination claims under the federal-sector provision of the ADEA, 29 U.S.C. § 633a(a), is that "age must be the but-for cause of *differential treatment*, not that age must be the but-for cause of the *ultimate decision*."  *Babb*, 140 S. Ct. at 1174.  Justice Thomas observed in his dissent that "[b]ecause § 633a(a)'s language also appears in the federal-sector provision of Title VII, 42 U.S.C. § 2000e-16(a), the Court's rule presumably applies to claims alleging discrimination based on sex, race, religion, color, and national origin as well."  *Babb*, S. Ct. at 1181 (Thomas, J., dissenting).  The Eleventh Circuit agreed and held that "[b]ecause the relevant provisions of the ADEA and Title VII are essentially identical, the *Babb* Court's interpretation of the ADEA's phrase 'personnel actions … shall be made free from any discrimination based on' must control here, too."  *Babb v. Sec'y, Dep't of Vet. Affs.*, 992 F.3d 1193, 1199-1200 (11th Cir. 2021).  Now, plaintiffs bringing discrimination claims under § 2000e-16 must only present evidence that certain personnel actions were

tainted by disparate treatment based on protected status.  *Babb*, 992 F.3d at 1199-1205.  However, the but for causation standard still applies in some circumstances: "plaintiffs who demonstrate only that they were subjected to unequal consideration cannot obtain reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision.  To obtain such remedies, … plaintiffs must show that … discrimination was a but-for cause of the employment outcome."  *Babb*, S. Ct. at 1177-78.

And because the Circuit has held that "retaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)," plaintiffs bringing retaliation claims under § 2000e-16 need only show that certain personnel actions were tainted by discrimination based on protected activity. *Babb*, 992 F.3d at 1198-1205; *see also Tonkyro v. Sec'y, Dep't of Vet. Affs.*, 995 F.3d 828, 833-35 (11th Cir. 2021); *Buckley v. McCarthy*, 2021 WL 2403447, at *7 (M.D. Ga June 11, 2021).

Thus, even if a defendant presents non-pretextual reasons for its actions, "the presence of those reasons [does not] cancel out the presence, and the taint, of discriminatory considerations."  *Babb*, 992 F.3d at 1204 (citing *Babb*, 140 S. Ct. at 1172-73).  This shift has obvious implications for the *McDonnell Douglas* burden-shifting framework.  At the very least, a federal employer cannot escape all liability because it had a legitimate, non-discriminatory reason for its action or because it would have taken the same action notwithstanding of tainted motive.

As for *retaliatory* hostile work environment claims, the Circuit held that the proper test is no longer whether the pertinent conduct is "'sufficiently severe or pervasive' that it

can be said to alter the terms, conditions, or privileges of employment." *Id.* at 1205-09. Instead, the Court relied on its decision in *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020), to hold that the appropriate test is whether the underlying actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Babb*, 992 F.3d at 1205-09.

Given all this, the Court ordered supplemental briefing. Doc. 47.

### A. Race, Sex, and Age Disparate Treatment Claims

The federal-sector provision of Title VII provides that personnel actions "shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Babb*, 992 F.3d at 1198 (quoting 42 U.S.C. § 2000e-16). As discussed, a plaintiff seeking to bring discrimination claims under this provision of Title VII need only show that certain personnel actions were tainted by "differential treatment based on a protected characteristic." *Id.* (quoting *Babb*, 140 S. Ct. at 1174) (internal quotation marks omitted). Personnel actions in the federal employment context "include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb*, 140 S. Ct. at 1172-73 (citing 5 U.S.C. § 2302(a)(2)(A)). Similarly, the ADEA requires that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age …, in the United States Postal Service … shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). In short, for his race, sex, and age claims, Carter must establish that the relevant adverse actions were tainted by discriminatory animus, not that discrimination was a but for cause of the adverse action.

The Postal Service's response to *Babb* and its fallout is two-fold.  First, the Postal Service asserts that Carter does not seek "injunctive or other forward-looking relief."  Doc. 51 at 6.  Rather, he seeks only "reinstatement, backpay, and compensatory damages."  *Id*.  Thus, the Postal Service argues, "the new *Babb* causation standard … is irrelevant for purposes of analyzing Carter's race, sex, and age discrimination claims."  *Id*.  Thus, Carter must still meet the but for causation standard, and the Postal Service's unrebutted legitimate, non-discriminatory reasons defeat Carter's claims.  *Id*. at 3-7.

Second, even if *Babb* applies, the Postal Service argues summary judgment is still warranted because Carter fails to provide any direct evidence that his race, sex, or age "played any role in his workplace assignment during the five-month period in which Carter was returned to work in order to earn his pension."  *Id*. at 7.  As for circumstantial evidence, the Postal Service contends that Carter "presents no argument … that any individual outside his protected classes was treated differently in any regard.  And he fails to show by any other means that his work assignments and the conditions of employment were in any way tainted by race, sex, or age discrimination."  *Id*.

Carter's supplemental response, like his initial response, provides little substance concerning how his race, sex, or age were a cause, but for or otherwise, of differential treatment.  *See generally* Docs. 44; 50.  To the extent that he mentions race, sex, or age, Carter asserts that he "fall[s] into multiple categories under the EEO laws of America" because he is an African-American male.  Doc. 44 at 2.  Moreover, in 386 pages of deposition testimony, the only thing remotely related to Carter's age as a factor in the Postal Service's decisions was Carter's assertion that he was "an older black man who ain't taking no crap from nobody."  Doc. 42-3 at 54:21-23.  In his 130-page

response, the only argument concerning Carter's age is that he is "well over 40."  Doc. 44 at 2.

The Postal Service's argument that *Babb* does not apply because Carter does not seek injunctive or other forward-looking relief does not quite work.  In addition to seeking compensatory damages, Carter asks reinstatement and "that the Court grant such other relief as may be appropriate, *including injunctive orders*, damages, costs, and attorney's fees."  Doc. 4 at 4 (emphasis added).  Admittedly, it is unlikely, given that Carter is retired from the Postal Service, that he could obtain injunctive or forward-looking relief.  But he could, potentially, recover nominal damages.  In other words, the Postal Service, if it moved for partial summary judgment, could possibly gut Carter's case because he cannot establish the but for causation necessary to recover compensatory damages.  But the Postal Service could not completely dispose of Carter's case on that ground.

Accordingly, the Court turns to the Postal Service's second argument: whether the Postal Service is entitled to summary judgment on Carter's race, sex, and age discrimination claims, assuming *Babb*'s new causation landscape applies.

First, Carter's claimed "adverse actions" are not, individually or in the aggregate, adverse.  For now, it is only necessary to discuss the events that involve Carter's compensation and conditions of employment.  But an overarching point must first be made—in their settlement agreement, the parties precisely defined Carter's status during his brief reinstatement and the Postal Service indisputably fulfilled its obligations under the agreement.  They agreed to return Carter to "full employment … at the same pay and grade that he had before being removed."  Doc. 42-4 at 2.  Carter testified that

he was paid as a Level 20 Postmaster.  Doc. 42-3 at 79:18-80:8.  And as the Postal Service points out, Carter "does not dispute that he was returned to work within the Atlanta District at the same pay and grade as before being removed."  Docs. 40-1 at 9; 42-3 at 76:8-85:22; 42-4; 44 at 4.  The settlement agreement also stated that the Postal Service would set Carter's "position(s) and tour times through … March 21, 2015."  Doc. 42-4 at 2.  Carter confirmed these facts during his deposition.  Doc. 42-3 at 79:10-80:15. Given Carter's admission that the Postal Service met its obligations regarding the terms and conditions of Carter's brief reemployment, Carter never explains how the Postal Service's alleged adverse actions were, in fact, adverse.

Carter's complaint that he had to use a "PS Form 1261" to document his hours from November 1-5, 2014, which resulted in pay adjustments one month later, is trivial. Docs. 42-3 at 35:13-39:22, 66:9-76:8; 44 at 3-4.  Carter thinks the adjustments were "unnecessary" because the Postal Service could have placed him on "auto pay."  Docs. 42-3 at 35:13-38:2; 44 at 3-4.  But Carter admits the pay adjustments were quickly addressed.  Moreover, after the adjustments, Carter emailed Mauldin and other Postal Service employees thanking them for "addressing [his] pay situation promptly."  Docs. 42-3 at 38:13-39:22; 44-21 at 1.  Carter even testified that he thought the adjustments being done in one month was "prompt."  Doc. 42-3 at 39:2-18.

Next, it is undisputed that Carter was not entitled to a "night differential."  Docs. 42-3 at 76:8-85:22; 44 at 4.  Carter argues that even though he was returned to his pay grade, Level 20 Postmaster, he was not doing the job of a Postmaster, and therefore, his pay should not have been lowered.  Docs. 42-3 at 76:8-85:22; 44 at 4.  However, a side-by-side comparison of Carter's "PS Form 50" and the "USPS Handbook F-21"

clearly establishes that Carter, a Level 20 Postmaster, was ineligible for night differential pay.  Docs. 40-5; 40-6; 44-7; 44-8; 44-9.  While Carter's title during the relevant time was "Postal Liaison," because he was paid as a Postmaster—as the settlement agreement required—Carter was ineligible for "night differential" pay.[4]  Doc. 44-8.

As for other personnel actions, Carter testified that while working at the "301 TH" facility, he "was not doing any Postal work."  Doc. 42-3 at 118:12-15, 121:19-20.  Carter believed the assignment was implemented to "alienate" him from his co-workers and "marginalize" him.  *Id*. at 121:19-122:8.  And he felt like he was "stealing" because he "wasn't doing anything."  *Id*. at 122:14-123:15.  But Carter does not dispute that the 301 TH assignment complied with the settlement agreement.  Docs. 42-3 at 122:14-123:15; 42-4 at 2.

Even if Carter had established that he suffered adverse employment actions when the Postal Service allowed him to work until he was eligible for retirement, there is no evidence, direct or circumstantial, that any action by the Postal Service was tainted in any way by race, sex, or age discrimination.

Simply put, the Postal Service treated Carter as the parties' settlement agreement required.  And even if it did not, none of the trivial things Carter complains about rise to the level of adverse employment actions.  Nor is there any evidence, direct or circumstantial, that Carter's race, sex, or age were factors in any action taken by the Postal Service.

---

[4] Carter argues that his "Postal Liaison" title "supersedes" the "PS Form 50" that documented his Postmaster status.  Doc. 44 at 4.  But Carter does not provide any evidence to support his assertion.  Moreover, as the Postal Service rightfully points out, Carter's argument conflicts with what the settlement agreement required—Carter being returned to the "same pay and grade that he had before being removed."  Docs. 40-1 at 11; 42-4 at 2.

Accordingly, the Postal Service is entitled to summary judgment on Carter's race, sex, and age discrimination claims.[5]

## B. Retaliation and Retaliatory Hostile Work Environment Claims

Carter argues that the Postal Service retaliated against him because of his prior protected activity.[6]  To establish a prima facie case of retaliation, Carter must demonstrate: (1) that he engaged in protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between his protected activity and the adverse action.  *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021) (citations omitted).  "In the context of a retaliation claim, an adverse employment action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Green v. MOBIS Alabama*, LLC, 613 F. App'x 788 (11th Cir. 2015) (citing *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)). This standard also applies to retaliatory hostile work environment claims.  *Babb*, 992 F.3d at 1205-09.  As for causation, Carter must show that his protected activity and the Postal Service's adverse actions were not "wholly unrelated."  *Tolar*, 997 F.3d at 1294 (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020)).

For the alleged adverse actions at issue, the Court assumes Carter must only demonstrate that the Postal Service's actions were tainted by discrimination based on Carter's protected activity.  *Babb*, 992 F.3d at 1198-1205; *Tonkyro*, 995 F.3d at 833-35; *Buckley*, 2021 WL 2403447, at *7.  Thus, even if the Postal Service had non-pretextual

---

[5] The Court notes that even if it analyzed his claims under *McDonnell Douglas*, Carter cannot establish a prima facie case of discrimination based on race, sex, or age.  Apart from not suffering an adverse employment action, Carter makes no attempt to provide a comparator.  *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019); *see generally* Docs. 4; 44.

[6] Although the federal-sector provision of Title VII does not explicitly bar retaliation based on protected activity, courts have recognized that "retaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)."  *Babb*, 992 F.3d at 1203 (citation omitted).

reasons for its conduct, "the presence of those reasons [does not] cancel out the presence, and the taint, of discriminatory considerations." *Babb*, 992 F.3d at 1204 (citing *Babb*, 140 S. Ct. at 1172-73).

Again, Carter's claimed "adverse actions" are not, individually or in the aggregate, adverse. Indeed, Carter's claimed belief that the Postal Service persecuted him is without merit. Carter negotiated a settlement that allowed him to return to work at full pay and secure his retirement. The Postal Service fulfilled its obligation under the agreement, only to see Carter file another claim. Nevertheless, given the relatively lenient standard for retaliation claims—well might have dissuaded a *reasonable* worker—the Court examines in detail each of the incidents Carter claims were adverse actions.

**1. Carter alleges that he was not provided with work assignments before returning to work.** Specifically, Carter complains that he was not provided with an assignment "[o]n the dates of November 1st through the 5th, 2014, and January 3rd through the 5th, 2015." Doc. 42-3 at 29:8-17.

Regarding November 1 through 5, Carter testified that the Postal Service had not yet provided him with a work assignment as the date for his return approached. *Id*. at 29:18-31:22. So, Carter reported to the Rex Post Office because he thought that was the best decision. *Id*. Mauldin then told Carter to report to the "VMF manager" in Duluth, Georgia. Doc. 42-3 at 33:5-34:4. Once there, Carter was told that the CTHO would not be operational until late-November, so he reported to Atlanta NDC but was then told to report to the 301 TH facility until "November 26th, 27th" when the CTHO would be operational. Doc. 42-3 at 33:5-35:6.

From January 3 through 5, Carter claims he did not have an assignment because the CTHO assignment had ended.  Doc. 42-3 at 39:23-41:21.  Carter emailed Mauldin, and she responded "a half hour later" instructing Carter to return to "301 TH with the same schedule."  *Id*. at 39:23-41:21.  Carter worked at 301 TH until March 21, 2015— his mandatory retirement date.  Docs. 42-3 at 42:9-25; 42-4 at 2.

Carter contends that the Postal Service had ample time to finalize his assignment and that "it is a very serious issue when a person doesn't get a[] properly written work assignment."  Docs. 42-3 at 49:21-51:18; 44 at 2-3.  But Carter's deposition testimony confirms the obvious—these glitches, if they even amount to that, were trivial.  Mauldin quickly responded to each work assignment request, and Carter was paid for his time.  Docs. 42-3 at 35:13-39:19; 42-4 at 2.

It is difficult to see how these trivialities amounted to an inconvenience, much less retaliatory actions that would dissuade a *reasonable* worker from engaging in protected activity.  Moreover, there is no evidence, direct or circumstantial, suggesting the slightly delayed assignments were tainted in any way by discrimination based on protected activity.

**2.  Carter claims that he was improperly required to use a "PS Form 1261" to document his time.**  During his time at 301 TH, Carter recorded his time on a "PS Form 1261" which, according to Carter, was meant to track the work of multiple employees.  Doc. 42-3 at 66:13-70:1.  Carter objected to using the PS Form 1261 because he was a manager and wanted to be on "auto pay" like "[e]very Postal manager."  *Id*. at 68:1-9.  The Postal Service argues, citing Mauldin's affidavit, that "the very reason [Carter] was asked to record his time on a PS Form 1261 was borne of the

fact that, upon returning to work in November [2014], [Carter] experienced issues with his time being recorded properly and his pay being charged to the correct location." Docs. 40-1 at 11; 40-4 at 7.  Carter contends that the requirement was a "constant interruption" and "totally unnecessary."  Doc. 44 at 3.  He also says that the correct procedure would have been to use a manual timecard occasionally.  *Id*.  But, as discussed, Carter actually praised the Postal Service for its handling of this "issue." Docs. 42-3 at 35:13-39:19; 42-4 at 2.  This event was not an adverse action, and there is no evidence that it was tainted by retaliatory animus.

### 3.  Carter claims that he was not paid properly while working at the CTHO.

As discussed, Carter's claim that he was owed "night differential" is wholly without merit. Doc. 42-3 at 76:8-78:12.  The settlement agreement required the Postal Service "to return [Carter] to full employment … at the same pay and grade that he had before being removed."  Doc. 42-4 at 2.  The agreement also stated that the Postal Service would determine Carter's assignments through March 21, 2015.  *Id*.  At no point during the discussion of this issue did Carter allege that the Postal Service did not comply with the agreement concerning his pay.  In fact, Carter said that the Postal Service's assignment complied with the settlement and that he was being paid as a Level 20 Postmaster.  Doc. 42-3 at 79:10-80:15.  Complying with the settlement agreement is not an adverse action.  And Carter never even argues there is evidence that the Postal Service's failure to pay night differential was retaliatory for his protected activity.

### 4.  Carter claims that he was denied computer access from November 1, 2014, through January 21, 2015.  The Postal Service allegedly "denied" Carter access to a computer at two post offices, Forest Park, Georgia and McDonough, Georgia.

Docs. 42-3 at 85:22-24, 87:8-14; 44 at 4-5.  Carter testified that as a Postal Service employee, he required computer access "to be up to date and aware of everything that's going on in the post office."  Doc. 42-3 at 93:8-23.

It is not clear that Carter needed a computer to perform his assigned duties; other Postal Service workers where Carter was assigned also did not have access to a computer.  Docs. 40-1 at 13; 40-4 at 28.  However, they, like Carter, "were allowed access to other facilities to access a computer."  Docs. 40-1 at 13; 40-4 at 28.  Moreover, Mauldin offered a solution to Carter's complaint in short order.  On January 21, 2015, Carter emailed Mauldin about the lack of access to a computer.  Docs. 42-3 at 94:24-95:6; 44-10.  *Twenty minutes* later, Mauldin responded:

> You may use the Peachtree P&DC or Crown Rd facility. Let me know when you would need access and I will schedule a time with the managers to allow you computer or copier access.

Doc. 44-10.  Carter argues, in his usual conclusory manner, that not having computer access at the "301 THS facility" was an "extreme safety issue."  Doc. 44 at 5.  But Carter's real issue, as petty as it was, was personal convenience.  Carter felt that there was "no way in hell [he] should have [had] to request someone meet me at the door so [he] could use a computer."  Doc. 42-3 at 96:3-11.  This event was not an adverse employment action.

Finally, Carter once again makes no effort to demonstrate that the Postal Service's "decision" to deny him his own computer was tainted by discrimination based on protected activity.  Doc. 44 at 4-5.

**5.  Carter claims that he was improperly assigned to the Atlanta NDC plant on November 5, 2014.**  The fifth issue involves Carter's drive to the Atlanta NDC plant.

According to Carter, he was told to report to the 301 TH location because the manager at NDC was going on maternity leave.  Doc. 42-3 at 110:8-25, 116:22-117:2.  Carter admits that he does not know why the Postal Service initially assigned him to the Atlanta NDC plant, but he speculated that it was done to harass him.  *Id*. at 117:3-13.  But beyond his speculation, Carter has no evidence of harassment.  Doc. 42-3 at 34:15, 113:8-10.  Moreover, while Carter may have been irritated by having to drive to Atlanta NDC only to be directed to 301 TH, by Carter's admission, the Atlanta NDC assignment was allowed under the settlement.  Again, this is another trivial matter that would never dissuade a *reasonable* worker from engaging in protected activity.

Most importantly, beyond mere speculation, Carter offers no evidence, direct or circumstantial, that his drive to Atlanta NDC was in any way tainted by discrimination based on prior EEO activity.  Doc. 44 at 6-7.

**6.  Carter claims that he was improperly assigned to the 301 TH facility from November 15, 2014, through November 23, 2014.**  He argues this assignment was "certainly an attempt to isolate [him] from other postal employees and put me in harm[']s way physically with employees whom were not govern[ed] by any federal guidelines."  Doc. 44 at 7.  But in his deposition, he admitted he had no evidence supporting his theory.  Doc. 42-3 at 122:9-123:7.  Certainly, there is no evidence remotely suggesting Carter was in "harm's way."  Rather, the Postal Service, consistent with the settlement agreement, assigned Carter to a Postal Service facility, and he was paid for the duties he performed there.  Working at the 301 TH facility was not an adverse employment action.  Nor is there any evidence that the 301 TH assignment was tainted by discrimination based on protected activity.  Doc. 44 at 6-7.

**7.   Carter claims that his wife was improperly charged with sixteen hours of being absent without official leave ("AWOL").**   Carter argues that the Postal Service retaliated against him and violated the Family Medical Leave Act ("FMLA") and Postal Service policy by changing his wife's status to "Leave Without Pay" ("LWOP") and "AWOL," after his wife was hospitalized.   Docs. 44 at 7-9; 44-22.   According to Carter, his wife was hospitalized after a confrontation with George and other Postal Service employees.   Doc. 42-3 at 130:7-20.   Carter said that he and his wife then contacted his wife's supervisor to inform them about the hospitalization and to let them know the time away from work "probably will end up sick leave, FMLA."   *Id*. at 131:3-9.   According to Carter, no approval was required, and once his wife was hospitalized, it was "immediately protected."   Docs. 42-3 at 130:23-131:9; 44 at 7; 44-16.   Carter then emailed his wife's "doctor's papers" to Mauldin, George, and his wife's supervisors. Docs. 42-3 at 131:10-14; 44 at 8.   George then, according to Carter, recorded two days of AWOL.   Doc. 42-3 at 131:15-132:2; 44 at 8; 44-21 at 6-10.   Carter's wife "pursued her own EEOC charge, which advanced to a hearing, and the AJ dismissed her claim about AWOL hours."   Doc. 40-1 at 16; 42-5. Carter acknowledged that his wife did not appeal the AJ's decision.   Doc. 44 at 9.

Carter claims that George's actions were done to "get at [him]" and "cause physical, emotional, and mental damage[]."   Doc. 42-3 at 134:24-135:4.   He cites no evidence to support this claim.   In any event, the Postal Service's apparently proper action regarding Carter's wife is not an action adverse to Carter.

**8.   Carter claims that his supervisor did not provide him with an end-of-year performance discussion and improperly entered "employee being separated" into**

**the comment section of Carter's evaluation.**  On November 3, 2014, Lowery completed Carter's performance evaluation.  Doc. 44-14 at 1.  Under the heading, "End-of-Year Reason for No Discussion and Comments," Lowery wrote "Separated or Retired – Employee pending separation."  *Id*.  Of course, by that time, Carter and the Postal Service had reached their settlement, and Carter had returned to work.  But it is undisputed that Lowery did not know that.  Doc. 40-7 at 2.  Based on what Lowery knew on November 3, his statement was correct.  Carter does not claim to have evidence suggesting that Lowery's statement was made to retaliate for Carter's protected activity, which is hardly surprising given the circumstances.  In any event, there is no evidence that Lowery's unwitting mistake was tainted by discriminatory animus.

>   *9.  Carter claims that he was isolated from his peers and other employees, and that the Postal Service inflicted hardships on Carter and his family.*  Carter claims that Mauldin, Lowery, George, and Foster did not do anything to make his return to work a "smooth transition" and "engaged in all kinds of stuff" to make his life a "living hell."  *Id*. at 157:5-23.  Essentially, this is just a general summation of Carter's claims against the Postal Service, and Carter provides no specifics as to how the alleged actions are connected to Carter's protected activity.

For instance, when asked how Mauldin isolated Carter, he said that "[s]he sought to isolate me and place me where there were no other [Postal Service] employees."  *Id*. at 160:24-161:10.  Carter said the issue was "compounded" by requiring him to use computers in "any of the offices."  *Id*. at 161:11-17.  To the extent that Carter references issues four through six, they are addressed above.  When asked what hardships Mauldin inflicted on him, Carter said, "[w]ell, mental, physical, financial. Well, you name

it." *Id*. at 161:18-21.  When probed for specifics, he said, "I think I just named it. Physical – physically, mentally, and financially."  *Id*. at 161:22-24.  As to financial hardships, as discussed above, Carter was returned to work at the same pay and grade he had before being removed.  Doc. 42-4.  Moreover, any pay adjustments that were made were described in Carter's own words as "prompt."  Docs. 42-3 at 38:3-39:22; 44-21 at 1.  In sum, there is no evidence, direct or circumstantial, that the Postal Service inflicted hardships of any kind on Carter.

**10.  Carter claims that he was subjected to ongoing harassment, as it was "one thing after another."**  Carter's tenth claim involves unspecified dates and centers on him being "subjected to ongoing harassment."  Doc. 42-3 at 165:7-11.  In his response, Carter recaps the previously discussed nine issues, including "pay issues, privacy violations, hostility, retaliation, location blockage, and safety issues."  Doc. 44 at 5.  Carter does not provide any details or evidence beyond this statement, and his deposition sheds no light on how this issue qualifies as retaliation.  It follows that for the reasons stated, Carter suffered no adverse employment action, and there is no evidence that anything the Postal Service did was tainted by retaliatory animus.

In sum, none of the events that allegedly occurred when the Postal Service allowed Carter to return to work so he could secure his retirement benefits, separately or together, would have dissuaded a reasonable employee from engaging in protected activity.  Nor is there any evidence, direct or circumstantial, remotely suggesting that anything the Postal Service did or did not do was motivated by retaliatory animus. Accordingly, the Postal Service is entitled to summary judgment on Carter's retaliation and retaliatory hostile work environment claims.

### C. Hostile Work Environment

Hostile work environment claims pursuant to § 1981 and Title VII are analyzed under the same analytical framework. *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). To establish a prima facie case for a hostile work environment claim, a plaintiff must prove that (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her race or gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) there is a basis for holding the employer liable. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). "[T]o be actionable the harassment must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Bryant*, 575 F.3d at 1297 (internal quotations and citations omitted).

When evaluating whether the harassment is sufficiently severe or pervasive, the Court looks at the totality of the circumstances and considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Freeman v. City of Riverdale*, 330 F. App'x 863, 865 (11th Cir. 2009). Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276-77 (11th Cir. 2002); *see also Smithers v. Wynne*, 319 F. App'x 755 (11th Cir.2008) (citing Miller and stating same). It is not sufficient to merely highlight a couple of utterances, even a couple of racial slurs, as evidence of a

hostile work environment.  The Supreme Court has noted that "teasing, offhand comments, and isolated incidents" do not constitute discriminatory changes in terms and conditions of employment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted).

In other words, the "standards for judging hostility are sufficiently demanding to ensure that [discrimination laws do] not become a general civility code."  *Byrne v. Alabama Alcoholic Beverage Control Bd.*, 635 F. Supp. 2d 1281, 1296 (M.D. Ala. 2009) (quoting *Faragher*, 524 U.S. at 788).  *Compare Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) (seven incidents of racist acts, including several co-workers wearing clothes bearing the Confederate flag on the same days and leaving bananas in the plaintiff's truck, could be considered "as threatening confrontation" and, thus, was severe and pervasive behavior); *Miller*, 277 F.3d 1269 (behavior was severe and pervasive when ethnic slurs were directed towards the plaintiff three to four times a day while the plaintiff was trying to perform his work duties); *with Hall v. Dekalb Cnty. Gov't*, 503 F. App'x 781 (11th Cir. 2013) (unpublished) (behavior was "improper," but did not rise to the level of severity or pervasiveness necessary to sustain a hostile work environment claim when a co-worker referred to the plaintiff as "boy" and, when the plaintiff reported this comment, his supervisor laughed); *Smithers*, 319 F. App'x 755 (behavior was not severe and pervasive when plaintiff's supervisor allegedly made negative comments about the plaintiff and the plaintiff thought others in the office were gossiping about him); *Satchel v. Sch. Bd. of Hillsborough Cnty.*, 251 F. App'x 626 (11th Cir. 2007) (it was not objectively reasonable for the plaintiff to perceive "workplace disputes" as severe enough to constitute a hostile work environment claim).  *See also*

*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (behavior was not severe and pervasive to sustain a hostile work environment claim based on sexual harassment when the plaintiff's supervisor rubbed his hip against the plaintiff's hip while touching her arm and smiling, stared at the plaintiff's groin area three times, and constantly followed and stared at the plaintiff).[7]

While Carter's complaint alleges a hostile work environment claim, he never gets around to alleging, much less providing evidence, that anything the Postal Service did or did not do was based on a protected trait.  Moreover, even the most liberal reading of the ten incidents thoroughly discussed above reveals nothing remotely suggesting the Postal Service's actions were sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatorily abusive work environment.

Accordingly, Carter has failed to establish a prima facie case of a hostile work environment; thus, the Postal Service is entitled to summary judgment on Carter's hostile work environment claim.

### D. "Retaliation-Violation of Privacy Act, Harassment, Creation of a Hostile Work Environment by Postal Service Counsel Sion New"

As discussed, the parties incorrectly assume that Carter's complaint attempted to allege a claim of some sort either against Sion New, who is not a party to this case, or against the Postal Service based upon something New did or caused to be done. Although the complaint identifies New as a witness and attaches correspondence concerning New, nothing in the complaint can be read as an attempt to allege a claim based on New's conduct or actions committed at his behest.  Doc. 4 at 3, 15-16, 21.

---

[7] "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."  *AMTRAK v. Morgan*, 536 U.S. 101, 116 n. 10 (2002).

And if Carter intended to assert such a claim, his complaint completely fails to allege a plausible claim.  Even considering Carter's *pro se* status, it is impossible to discern a cognizable claim that comes close to meeting the pleading requirements under Rule 8 of the Federal Rules of Civil Procedure.

But using the parties' briefs as a guide, their interpretation is that this claim, had it been plead, would have been a retaliation claim arising from the disclosure of Carter's "EEO protected information" to Ms. Foster.  Accordingly, the Court addresses that characterization of the alleged claim.

During Carter's December 9, 2016 deposition, New asked Carter if he had a copy of the application for his annuitant position in Austin.  Doc. 42-3 at 208:17-19.  Carter responded, "No, but you can find it.  Knock yourself out.  Why would I have it with me?"  *Id*. at 208:20-21.  On December 14, New's paralegal contacted Foster about the application, and Foster documented the conversation in a December 23 letter, which Carter attached to his complaint.  Docs. 4 at 21; 40-9; 44-26; 44-29.  Foster was asked about Carter's application, but Foster said that she did not have access to that information and referred the paralegal to someone Foster believed would be of assistance.  Docs. 4 at 21; 40-9; 44-26; 44-29 at 2.  According to New, he never spoke with Foster.  Docs. 40-9 at 2; 44-29 at 2.

Assuming Carter had alleged a retaliation based on these facts, the Postal Service is entitled to summary judgment on that claim.  First, New did exactly what Carter suggested in his deposition—he instructed his paralegal to get a copy of Carter's application for an annuitant position.  Second, Carter's evidence—the letter from Foster Carter attaches to his complaint—establishes that Foster in no way considered the

request inappropriate.  In short, that innocuous contact would not dissuade a reasonable worker from engaging in protected activity.  And there is no evidence that the request, for which Carter opened the door, was in any way tainted by retaliatory animus.

## IV. CONCLUSION

For the reasons discussed above, the Postal Service's motion for summary judgment (Doc. 40) is **GRANTED**.

**SO ORDERED**, this 21st day of September, 2021.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT